Good morning. We'll hear the first case on the calendar, Agerbrink. Good morning. May it please the Court, Cyrus Duggar for Plaintiff Appellant Eva Agerbrink. This case is ultimately about economic control and economic dependence. The economic reality test asked this Court to answer a simple question, whether as a matter of economic reality, plaintiff relied on MSA for the opportunity to render fit modeling services. And the answer to that is clearly yes. We think there are six uncontested facts that we believe the Court can anchor its decision finding her to be a plaintiff, finding her to be an employee as a matter of law. Those are that she had a three-year non-terminable contract. During the three-year term, she could not work for any other modeling agency anywhere else in the world. Third, she could not work independently of MSA, both because of its contractual restrictions and because of its threats to and actual interference with her attempts to do so. Fourth, she was subject to significant economic penalties if she turned down work offered to her by MSA, if she tried to leave the agency generally, or if she violated any of MSA's contractual requirements or policies. These penalties included being made unavailable if a client requested her, being dropped by the agency but held to her three-year non-compete so she couldn't work during that term, and third, having months of wages garnished, unpaid wages garnished under the illegal penalty provision. Why, at this stage, aren't there disputed issues of fact? Your adversary would raise questions about just about everything you've just said, and so why shouldn't this just go back to the district court? We agree that at a minimum that's what should happen here. At an absolute minimum, the defendant's positions, we don't believe that they're actually supported by their record, but if they are supported by their record, then there are at a minimum here a number of disputed facts, and with respect to MSA's motion for summary judgment, all of those facts that are genuinely disputed should be read in the light most favorable to plaintiff, and then Your Honor is correct. At a minimum, we agree that there should be vacature of the grant of summary judgment for MSA. You said that she faced penalties if she refused work from MSA? Correct. Didn't the district court conclude that she was set free to set her own work and determine what work she wanted to accept or reject? The district court didn't address any of the four things I just mentioned, and there are two more I wanted to add. The district court's analysis — I'll do my best to try and let you get to that, but you've raised my interest, so I'm not going to let you go that far just yet. The district court didn't address any of the potential penalties that are — And that's a function of the contract, you say? She has to use her best efforts under the contract, so she can't refuse work without eventually violating the contract. So tell me where in the contract it specifically provides that if she refuses work, she faces a penalty. It doesn't specifically state that, Your Honor, but to use — Well, you just said it did, and so I need to know what you base your assertion on. The assertion about penalties for declining work is based on the testimony of agency owner Susan Levine, who testified that if models are constantly unavailable or uncooperative, they would be dropped. The same testimony was — They drop them. So that's exactly what she wants. So it would seem to me if she just kept refusing works, sooner or later she'd be free of the contract. Well, so — but you used the word penalties. I wrote it down the minute you said it, and I need to know, and I need to know if you can back that up or if that's a little bit of puffery. Testimony from Susan Levine confirms it. Testimony from former agency director Anthony Higgins confirms it. There are e-mails that confirm when models do not take work that's given to them, they can be made unavailable. So that would mean as a penalty, if you say no to work too many times, you're at risk for being made unavailable. Wait a second. They are free to set their own work schedules, aren't they? No, Your Honor. Who decided to work for QVC? Your client or did MSA tell her she had to work for QVC? Your Honor, it is true that like the employees in Brock and in the Gale nurse case, every employee has the literal right to — Just stick with my question. Who decided to work for QVC? Did they send her to QVC and say you must work for QVC, or did she go and get the QVC job herself? We agree, Your Honor. Literally, she did in fact agree. Okay. So if you just answer the question, you'll get a chance to get to your other things. So don't — I understand that you're advocating for your client here, but let's stick to the record a little bit here. So she controlled who she worked for, didn't she? She could literally decide to go to work or not. Didn't she negotiate the wage that she got from QVC? No, Your Honor. That was negotiated between — that's something the district court got wrong among many omissions and mischaracterizations. But the point is MSA and QVC negotiated that job before Eva Agerbrink ever went to meet with that client. They point out that she was not in fact ever disciplined, and she did turn down work for vacation and for other purposes and that she never suffered any discipline. So what's your response to that? She had to request vacation. She was reprimanded for requesting a day off. She took one day off in the 15-month period of time where she booked out. She was otherwise assumed to be available. And, yes, she was subject to discipline, Your Honor. In December, she said, you guys aren't paying me. I'm not — you're not getting me enough work. Why do I have — I'd like to go to a different agency. I'd like to leave. Liz Pinto sent her an email that said, under your contract, you cannot work with another modeling agency and you cannot work independently. That kept her from leaving until June. When she tried to leave, MSA emailed the prospective employer, threatened them with action. They — Susan Levine told Eva Agerbrink, if you go to work for Keshe on Monday, I'll never work in this town again. And then she hopped in a car and left. If you — if we sent this back for trial, what would be the material issues of fact that you would seek to prove? Where are the friction points here between your view of the facts and their views of the facts? What are the material issues of fact to be submitted to a jury? Well, looking at the district court decision, one of the main issues that the lower court got wrong is they relied entirely on a single sentence from Liz Pinto's declaration that said plaintiff dictated her own schedule. And it ignored all of the evidence to the contrary regarding penalties, the coordination of scheduling, the requirement to hold her time, the requirement to be available at all times for potential work. In addition, the lower court got wrong the issue I just discussed with Your Honor regarding the negotiation. When did the negotiation happen? And as we point out in our brief, all of the cites to the combined Rule 56 statement, it cites it not in the light most favorable to plaintiffs. So they're really — when you tease out the fact that there isn't control over your ability to schedule your time if you are subject to penalties for saying no to work, the Saleem drivers didn't have to — there was no penalty for not working at all. There's only a penalty for the Saleem drivers if they agreed to work and then recanted it. Here, plaintiff has to be available. If she doesn't take the job, she's at risk of being dropped. Now, what it means to be dropped is, okay, you're dropped, we're not going to give you any more work, but you're still not able to work for another modeling agency. Okay. So you're stuck in this modeling contract for three years. There's an example of this in the record for Katherine Cooper Brown that illustrates it well. She wasn't able to get a hold of the agency, and the agency — and she said to the agency, I'm exclusive with you, I can't get fit modeling work any other way. If you're dropped, you can't — you're not getting work. MSA controls the faucet of work opportunities. Okay. You can't work without them turning that faucet on. Can I ask you about the confidentiality designations and where things stand as to continued sealing of the briefs and joint appendix? You've withdrawn a substantial number of your confidentiality designations. Is that not true? We did not have — plaintiffs did not have many designations, Your Honor, but we have withdrawn them with the exception of the things we mentioned in our brief regarding home addresses and financial account numbers. Okay. Okay. Thank you. Thank you. Thank you. You'll have time in rebuttal. Good morning, Your Honors. My name is Evan Spelfogel for defendant appellees. As this Court previously recognized in its 2017 Saleem v. Corporate Transportation Group decision, it's the overall economic realities of the relationship that determines whether an individual is an independent contractor or an employee under the Federal and State Wage Act. And so it's not simply — if there's some clause that uses the word independent contractor, that isn't in and of itself sufficient. That's correct, Your Honor. The courts below here, the court below, correctly decided on summary judgment that Eva Agerbrink, a FIT model, was not an employee of her management company, MSA, primarily for five non-exclusive reasons. She worked on her own schedule. She accepted and rejected work of her own choosing. She negotiated rates. She was not trained by MSA. And she invested significantly in her business in order to profit from profits and loss. On the first three of those, there's a disputed fact as to a portion of what you said, because MSA, all offers had to be run through MSA, right? Isn't that in the record? The record indicates — The client shall not attempt to negotiate nor others to negotiate with the models directly. Our companies have to negotiate, the offers have to be run through MSA, and then MSA is involved in the negotiations, right? The language of the contract is not determinative. What's determinative is the economic reality of what really happened here. Ms. Pinto testified that the plaintiff would be jeopardizing her contract if she spoke directly with QVC regarding her rate. Isn't that — that's not a document. That's testimony. That is correct, Your Honor. Why doesn't that create an issue of fact? It doesn't because there was clarification with respect to that. And, in fact, Ms. Agerbrink decided to take, for example, the QVC job, even though it was far below her normal customary hourly rates. That doesn't answer the concern raised by my colleague who said, But didn't the agency, though, negotiate and assert its rights to negotiate with — on behalf of Ms. Agerbrink? The MSA acted solely on behalf of Ms. Agerbrink and did not require her to accept any work, did not require her to accept any pay. The decision was ultimately hers. She did not consider an offer, a negotiated offer, on her own, yes or no. She specifically negotiated, accepted the below-standard job at QVC on her own. Was she allowed — The company acted — Is that a yes or a no? Was she allowed or not? She was — Under your understanding of the relationship between MSA and her. The relationship — From MSA's perspective, was she allowed to do this? She was allowed to do that, and MSA acted on her behalf to try to do the best for her as possible as she requested. And in the QVC situation, it could not persuade QVC to increase its rate, and Ms. Agerbrink thereafter negotiated directly with MSA to reduce MSA's fee for its services in connection with the QVC jobs. But didn't, let's say, for example, the apparel companies, they paid MSA, right? And MSA in turn would send payments to Agerbrink, isn't it? The apparel companies remitted payment for Ms. Agerbrink's services to MSA as a go-between. MSA then distributed the portion of that that was Ms. Agerbrink's and retained its portion for its services. But that — I mean, that suggests that they might have paid for her services, but that's not to say that she was paid by them. The money came from the apparel companies. The money was invoiced by paperwork that Ms. Agerbrink delivered to the apparel company. The apparel company representative filled out, signed. Ms. Agerbrink filled out and signed. It was then turned over to MSA for the ministerial task of processing the payment arrangement. Now, there's essentially a binary choice here that's being posited. Either you accept the job or decline a job. But what does that really have to say about the power of an independent business person to negotiate a rate of pay? In the normal situation, she would be able to negotiate her regular rate, which was approximately $200 to $250 an hour. In the QVC situation, QVC offered her a job in Westchester, Pennsylvania, over 100 miles away from her home in New Jersey, at a rate far below her standard rate. She did not have to accept it. She ended up telling MSA, please convey to QVC I will take that job at that rate, provided you, MSA, reduce your fees to me. And that was the arrangement. She then had to invest in a second all-weather vehicle to drive the 100 miles in the winter each way, and she invested in a second apartment in Westchester, Pennsylvania. And these clearly show that she had control over what she wanted to do, who she wanted to work for. At a certain point in time, she — It might also be indicative of an oppressive work situation. I mean, I get those facts way on one side in the analysis it's doing, and it's hard to figure out who's working for whom sometimes in these things. But the issue of who sets the rates really kind of becomes a real cornerstone issue here on the economic reality between these two, because if you set the rates, then she's working for you. Your Honor, in the Saleem case, in the Second Circuit, the customers, the businesses that retained — In Saleem, the drivers were free to accept other rides. They were free to work independently. They set their own hours. They — even though they wore uniforms and they had a code of conduct, they controlled their work in almost every other single aspect of it. The question here is, if you controlled the work, essentially controlled the work that she got, and or controlled how much she was paid, the fact that you may have — that your contract required her to pay for her incidentals, including a car or lodging or other things, is just a function of her employment. Some employees pay their own way. Other employees get reimbursed for it. I recognize that it may be some indication of independent contractor, but doesn't it really all turn ultimately on who controls her pay? No, Your Honor. You don't think so? There are multiple factors in the economic realities test to be concerned with. Are you saying that if we were to find that there's — if a jury were to find or a judge were to find that you set her pay, you set her rate of pay, you set her rate of pay, that that — that she could still be an independent contractor? We don't have that case in front of us, Your Honor. I didn't ask you that. I asked you to tell me what you thought, if that were the case. Now, you can either answer the question or not, and we'll go on and I'll decide the case without the benefit of your answer. Understood. Thank you. If the company were to have set the rates, that would not be by itself determinative of the independent contractor employee issue. Because? Because there were five, six, seven other factors that had to be considered as part of the equation. Which were? Whether she performed — whether the FIT modeling work was routine or required independent judgment exercise of certain — Your advertisement said no experience necessary. Go ahead. Ms. Agerbrink had over 20 years of experience. I don't care what she had. I'm asking you what your ads say in terms of what a FIT model needed to do the job. She might have been an exceptional one, but the question is what was needed to do the job. Go ahead. This was not a class action, Your Honor. I didn't say it was. Go ahead. The question of profit and loss. She determined her profit and her loss opportunity. It doesn't go to rates?  In fact, she decided after working for QVC for a year or so, she decided it wasn't profitable enough for her, and she decided not to do that job anymore, and she left that job. Let me ask you this question. MSA is entitled to a commission from work that Agerbrink secured on her own, correct? It never assessed that, but that's what the contract said. Okay. So if that's true, then how can you say that MSA didn't exert control over Agerbrink? It never happened in this situation, and that fee that it would be asking Ms. Agerbrink for was in the nature of deferred compensation for past services rendered in helping to introduce Ms. Agerbrink back into the career and to advance her FIT modeling opportunities. All this suggests that there are still a number of questions that need to be addressed. I hear the court, but I believe that the undisputed facts in the record are sufficient to ---- Let me just ask you, I thought your opposing counsel raised an important point about one of the key things you're relying on, the district court relied on, is that she could just not work at all, that she had the ability to do that, and that makes it similar to Selene. But what he points out is Ms. Higgins, and I read the deposition testimony myself, and Wadini both testified that if you turn down work, that you could be dropped and then still have that exclusivity provision binding you, and yet you're ruined then. So why doesn't that ---- Selene didn't have that, and Selene, they could work for anyone they want with no notice to the defendant. Here, if you wanted to work for any apparel company, you had to give notice, and you face the specter, if you turn down work, of being dropped and being bound by the exclusivity provision. In fact, the record shows that she turned down the QVC job ultimately, and she left and took a position with Cachet, a company situation where MSA received no compensation whatsoever. This was Ms. Agerbring's decision, and that's what the facts are in this case, the record, not what could have or might have happened.  I assume that you suspect they're hanging over her head, which compromises her independence, that she, to the extent she would want to turn down jobs, maybe she did in one instance, but in her overall relationship with your client, it's important whether or not she knows she can turn down jobs with no repercussions, and that doesn't clearly be the case here. In the 14 months that she worked under the second contract, there were only two jobs that she obtained, with Carol Hockman and with QVC. The company tried its best to encourage her and show her how to get additional work, and she was not able to. She ultimately turned down QVC, rejected it, because she and her accountant determined it was not profitable enough for her. She went in-house with Cachet. She took the Cachet job. She was threatened that she was violating her agreement, right? The threat was uttered in the course of a heated dispute, was never followed through on, and there were never any retaliation or reprisals taken by the company. That's clear in the record, Your Honor. Thank you. If we were to remand on the matters having to do with the sealing of documents, how should we proceed? Just have the district court go through the documents? I mean, why do we have to make a determination now if we were to remand the case? There are thousands and thousands of documents that are produced in discovery in this case that are part of this record. For example, Mr. Duggar referred to Cat Brown and other fit models. There's not a shred of evidence in the record that shows that this plaintiff, Ms. Agerbrink, was ever the subject of any of those e-mails, was ever disciplined or threatened with any action, or that she ever had knowledge that anyone else had been. Why wouldn't it have been enough? Why wouldn't it have been satisfactory just to redact the full names and the financial, specific financial figures? This is actually the agreement that Mr. Duggar and I agreed to for purposes of this oral argument, and I believe that that same position could be followed through with respect to the other documents which have been marked confidential, Your Honor. Thank you. Thank you. Thank you. A couple of quick responses, Your Honors. Just regarding penalties, I want to direct Your Honors to Appendix 102 to 105, 772 to 770. 102 to 105? 772 to 778, 845 to 870, and then again, 1484 to 89, 1565 to 1571, and 2140 to 2217. That is a large swath of the documents. Can you send us a letter after our argument today referencing those again? Sure. Not as quick as I used to. A couple of quick responses. There's no evidence in the record that Eva Agerbrink ever directly negotiated any financial terms or any rate with any client ever. That's not supported in the record, and even if there is some arguable support, it would be a hotly contested fact. In fact, there's nothing that Mr. Spillfogel brought up to Your Honors in his statements. It's not at an absolute minimum a hotly contested fact if there's any support for their position in the record. One thing just that the district court confused, when a plaintiff left QVC, it was at the same time she was attempting to leave the agency generally. So those two things happened at the same time, and that's sort of obscured in the district court's description of the facts. So it was the departure from the agency that MSA was primarily responding to at that time. The Saleem decision mentions the ability to work for competitors eight times in its decision. That fact, that exercise of control of having a non-compete, is the lens through which this court should view most of the factors. It affects if there isn't any investment, whether there's a point to investing if you can't bring it to a competitor with you or if you can't bring it with you after you leave the company. And the six facts I was beginning the opening with were she had a contract she couldn't terminate for three years. She couldn't work for any other modeling agency anywhere in the world. She couldn't work independently because of the contract, the threats beginning in December, or MSA's ultimate interference in letters to her and to the place she was trying to work. That letter is at page 28 of our plaintiff's opening brief. There's the, again, the penalties and the two other ones I was going to get to. She had to refer all work she got back to MSA. And MSA had no contractual obligation to give that work back to her. And the sixth point is that during the term, during the 15 months that we alleged she was an employee, she only worked for MSA with the exception of a week and a half at a spa. If the court finds that those facts are not genuinely disputed by MSA, they would be sufficient to find that she was an employee as a matter of law. Importantly, the district court's analysis did not address any of those six facts that I just described. Conversely, if the court finds that any of those six facts are genuinely disputed, it would be sufficient for the court to find that they're disputed facts. It would be sufficient for the court to find that looking at the record in the light most favorable to the plaintiff on defendant's motion that the lower court decision should be vacated and that there should be a trial. Thank you. Thank you, Paul. Nicely briefed. Thank you.